JS 44 (Rev. 1/2013)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Leticia, Inc.

## DEFENDANTS

Skanska Civil USA Northeast, Inc., Balu Kamat, Carmine Desio, Doe Corporation 1-10, and Does 1-10

**(b)** County of Residence of First Listed Plaintiff _____

*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____

*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Michael G. O'Neill
30 Vesey Street, Third Floor
New York, NY 10007

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*

*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' | Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 340 Marine | Liability | | ☐ 840 Trademark | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 USC 1964(c)

Brief description of cause:
Civil racketeering, DBE/MBE fraud in construction contracts

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.C.v.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:

JURY DEMAND:    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE  9/30/14

SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

### FOR OFFICE USE ONLY

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

CERTIFICATION OF ARBITRATION ELIGIBILITY

Local Arbitration Rule 83.10 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000, exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed.

I, Michael G. O'Neil            , counsel for Plaintiff            , do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

☒    monetary damages sought are in excess of $150,000, exclusive of interest and costs,

☐    the complaint seeks injunctive relief,

☐    the matter is otherwise ineligible for the following reason

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

## RELATED CASE STATEMENT (Section VIII on the Front of this Form)

Please list all cases that are arguably related pursuant to Division of Business Rule 50.3.1 in Section VIII on the front of this form. Rule 50.3.1 (a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 50.3.1 (b) provides that " A civil case shall not be deemed "related" to another civil case merely because the civil case: (A) involves identical legal issues, or (B) involves the same parties." Rule 50.3.1 (c) further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (d), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

## NY-E DIVISION OF BUSINESS RULE 50.1(d)(2)

1.)    Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County: No.

2.)    If you answered "no" above:
a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County?   NO

b) Did the events of omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District? Yes.

If your answer to question 2 (b) is "No," does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County?
(Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).

## BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.
☒    Yes              ☐    No

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?
☐    Yes    (If yes, please explain)              ☒    No

I certify the accuracy of all information provided above.

Signature: _____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Leticia, Inc,

                    Plaintiff,                          14  CV         (   )(   )

           - against -                          Complaint and Jury Demand

Skanska Civil USA Northeast, Inc., Balu Kamat,
Carmine Desio, Doe Corporations 1-10 and Does 1-
10,

                    Defendants.

Plaintiff, by its attorney, Michael G. O'Neill, complains against defendants as follows:

1.      This action seeks to recover damages for the injury to plaintiff's property and business caused by defendants' participation in the conduct of an enterprises's affairs through a pattern of racketeering activity.

2.      Jurisdiction over the subject matter of this lawsuit is by virtue of 18 U.S.C. §1964(c) and 28 U.S.C. §1331.  The Court also has jurisdiction over plaintiff's state law claims against defendants pursuant to 28 U.S.C. §1367.

3.      Venue is proper because one or more of the defendants resides in the Eastern District of New York.

4.      Plaintiff is a corporation.

5.      Skanska Civil USA Northeast, Inc. ("Skanska") is a New York Corporation.

6.      Balu Kamat ("Kamat") is an individual.

7.      Carmine Desio ("Desio") is an individual.

1

8.      Doe Corporations 1-10 are corporations, whose identities plaintiff expects to learn through discovery.

9.      Does 1-10 are individuals, whose identities plaintiff expects to learn through discovery.

10.      At all relevant times, plaintiff was engaged in the business of cartage and waste disposal.

11.      At all relevant times, Skanska was engaged in the construction business.

12.      At all relevant times, Kamat was a principal in Environmental Energy Associates, Inc. ("EEA"), a New York Corporation.

13.      At all relevant times, Desio was a principal in EEA.

## Background

14.      In 1980, the United States Department of Transportation  ("USDOT") issued regulations in connection with a program to increase the participation of minority and disadvantaged business enterprises ("DBEs") in federally-funded public construction contracts.

15.      Pursuant to those regulations, recipients of USDOT construction grants are required to establish a DBE program that, among other things, (1) establishes goals for the percentage of a construction project's work that should be awarded to DBEs ("DBE goals"); and (2) requires general contractors on construction projects to make good faith efforts to meet the relevant DBE goals.

16.      To become certified as a DBE, a company must, among other things, be owned and controlled by socially and economically disadvantaged individuals who own at least

2

51% of the company. Additionally, the company must be an independent business, one whose viability does not depend on its relationship with another firm or firms: The company must employ its own work force, own equipment necessary to perform its work, and be able to meet its financial obligations. To undertake work as a DBE, a company must also be certified as a DBE in the state within which it seeks to perform work.

17.     General contractors are permitted to count toward the attainment of their DBE percentage goals only funds paid to DBEs that performed a "commercially useful function" in the execution of a contract. Under the relevant rules and regulations, a DBE subcontractor performs a commercially useful function only where it: (a) is responsible for the execution of the work of the contract; (b) carries out its responsibilities by actually performing, managing, and supervising the work involved; and (c) furnishes the supervision, labor, and equipment necessary to perform its work. The rules also expressly provide that a DBE does not perform a commercially useful function "if its role is limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation."

18.     From at least in or about 1997 up to and including in or about 2011, Kamat, Desio and EEA engaged in systematic fraud in connection with the DBE programs adopted by, among others, the Metropolitan Transit Authority ("MTA"), the Port Authority of New York and New Jersey ("Port Authority"), and various New York City agencies such as the New York City Department of Environmental Protection and the School Construction Authority.

19.     The scheme typically worked as follows. Kamat and Desio caused EEA to enter into lucrative public construction subcontracts to perform an array of work including general construction, demolition, air testing, soil sampling, and hazardous gas monitoring. In

3

truth and in fact, and as Kamat and Desio well knew, EEA was itself incapable of completing

the work they contractually agreed to have EEA perform. Among other things, EEA lacked any

independent labor force and indeed had no regular employees other than Kamat and Desio;

EEA did not own any significant equipment; and while Kamat and Desio possessed some

relevant knowledge, they lacked the expertise to supervise the broad range of work that they

caused EEA to contract to perform.

     20.     Kamat and Desio arranged to have non-DBE third-parties actually perform

the work that EEA contracted to perform, and these non-DBE third parties accordingly

provided all the significant labor, equipment, and supervision necessary to complete that work.

     21.     In some cases, Kamat and Desio allowed the primary contractor to effectively

self-perform the work itself and create the false appearance that EEA was performing the

work.  In these cases, the primary contractor simply shifted its own workers to EEA's payroll;

the primary contractor supervised the "EEA workers" as they performed the work; the primary

contractor directly or indirectly furnished the equipment necessary for "EEA" to perform the

work; and the primary contractor paid EEA the funds necessary to meet the "EEA payroll."

     22.     On forms submitted to the primary contractor and/or the relevant

government agency or authority overseeing the construction project, Kamat and Desio falsely

represented that EEA had performed the work they had subcontracted to complete, knowing

that the primary contractors would, in turn, claim DBE credit in connection with EEA's work.

Indeed, the primary contractor then falsely represented to the relevant government agency or

authority that EEA had performed the work and that the primary contractor should, as a

result, receive DBE credit for EEA's work.

     23.     Kamat, Desio, Skanska and all the Doe defendants conducted the affairs of

4

EEA to engage in DBE fraud in connection with the following significant public construction projects, among others: the Fulton Street Transit Center - Dey Street Concourse; the 74th Street/Roosevelt subway station project; the Dekalb Avenue subway station project; the Times Square subway station project; the 53rd Street/Lexington Avenue subway station project; the Corbin Center portion of the Fulton Transit Center project; the Brooklyn Queens Expressway reconstruction project; and the Harmon Yard project.

## Allegations Specific To The Causes Of Action Asserted Herein

24.     In or about 2004, the MTA began work on the Fulton Street Transit Center Rehabilitation Project, a federally-funded initiative to develop a new transportation hub that would improve access to and connections among various subway lines in lower Manhattan. Part of that project included the creation and construction of a new underground passageway at Dey Street that would enable passengers on the "R" and "W" subway lines to transfer to the "4" and "5" lines and vice versa ("Dey Street Concourse Project").

25.     In or about the summer of 2005, the MTA awarded the Dey Street Concourse contract to Skanska in the amount of approximately $133 million.  The MTA established a ten percent DBE goal in connection with this contract, meaning that Skanska was obligated to make good faith efforts to enter into subcontracts with DBEs, the total value of which would equal ten percent of the overall contract.

26.     At all relevant times, plaintiff was a duly qualified, certified and bona fide DBE.

27.     In about March, 2006, Skanska entered into a subcontract with plaintiff (the "Cartage Subcontract") pursuant to which Skanska and plaintiff agreed that plaintiff would

5

perform all the trucking and disposal of waste material from the Dey Street Concourse project.

28.     Plaintiff duly performed its obligations under the Cartage Subcontract from about March, 2006 until about March, 2008.

29.     Unbeknownst to plaintiff, however, at a time and place presently unknown to plaintiff but believed to have been in or around 2005, the defendants had already entered into an agreement (the "Conspiracy") to participate in the conduct of EEA's affairs through a pattern of racketeering activity in order to steal from plaintiff and appropriate for themselves the benefits of the Cartage Subcontract.  The Conspiracy was part of a scheme by Skanska to defraud the MTA by purporting to satisfy the DBE requirements of the Dey Street Concourse project without actually subcontracting the required percentage of work to bona fide DBEs.

30.     In furtherance of the Conspiracy, Skanska entered into a contract with EEA (the "EEA Subcontract") to perform concrete and miscellaneous demolition work on the Dey Street Concourse Project.  In connection with the EEA Subcontract, Skanska, Desio and Kamat prepared and sent by the United States Mail to MTA paperwork falsely certifying that EEA was a bona fide DBE.  The certifications made by Skanska, Desio and Kamat included representations that EEA had the necessary employees, management and equipment to perform the work under the EEA Subcontract and that EEA performed a "commercially useful function" at the Dey Street Concourse Project.

31.     Those representations were false and Skanska, Desio and Kamat knew that they were false.

32.     Skanska, Desio and Kamat made those false representations with the intent to defraud the MTA and with the intent for the MTA to rely on them.

33.     As Skanska, Desio and Kamat knew full well, EEA did not provide a

6

"commercially useful function" in connection with the Dey Street Concourse Project because, in fact, Skanska effectively self-performed the work it had subcontracted to EEA and helped create the appearance that EEA had done commercially useful work on the project.  For example, with respect to the labor EEA supplied on the project, Skanska arranged to and did transfer three of its own long standing foremen to EEA's payroll so that these foremen could take the lead on the demolition work EEA had contracted to perform.  The crew that previously had worked with one of the three foremen on Skanska's other projects also transferred to EEA's payroll so that the foreman could perform the work with a crew of laborers familiar to him.

34.     Because EEA did not have any meaningful equipment of its own, EEA used Skanska's equipment while performing work on the subcontract, ranging from large equipment like a compressor to smaller supplies like shovels and gloves.  Skanska even made its own utility shed available to EEA - a benefit not regularly provided to any other subcontractor on the Dey Street Concourse Project.

35.     When it came to purchasing equipment for the subcontract, employees of Skanska negotiated the terms of equipment orders.  Skanska's employees simply communicated the terms and nature of these orders to Kamat and Desio so that Kamat and Desio could submit purchase orders for the equipment and, in so doing, make it appear as though EEA was providing a commercially useful function.  And because EEA did not have the financial wherewithal to pay its workers, Skanska typically transferred funds to corporate bank accounts controlled by Kamat and Desio so that Kamat and Desio could afford to issue paychecks to its workers.

36.     Skanska, Kamat and Desio intended to use EEA to defraud the MTA with

7

respect to the cartage and disposal of waste materials portion of the Dey Street Concourse Project, but doing so was more difficult. Skanska was not about to purchase a fleet of trucks for EEA. While it was possible for EEA to subcontract the trucking work, those trucks would have to have the name of the truck owners or carting companies prominently displayed thereon. Since the MTA physically inspected the worksite to verify the presence of DBE subcontractors, it would have been apparent to the MTA that EEA did not have its own trucks and was not a bona fide provider of trucking services.

37.      Therefore, in order to convince the MTA that it had entered into a subcontract with a bona fide MBE with respect to the cartage and waste disposal portion of the Dey Street Concourse Project, Skanska entered into the Cartage Subcontract with plaintiff. Plaintiff was a bona fide DBE and it owned a fleet of its own trucks.

38.      After the initial phase of the Dey Street Concourse Project, however, the MTA no longer physically inspected the site to verify the bona fides of Skanska's MBE subcontractors. At that point, Skanska began to divert cartage and waste disposal work from plaintiff and gave that work to EEA, which subcontracted the work to non MBE cartage and disposal companies.

39.      Ultimately, Skanska stopped using plaintiff for cartage and waste work for the Dey Street Concourse Project and Skanska, Kamat and Desio arranged for all such work to be performed by non MBE cartage and disposal companies. Upon information and belief, however, Skanska, Kamat and Desio certified to the MTA that the cartage and disposal work was being performed by a bona fide MBE.

40.      In furtherance of the Conspiracy, Skanska, Kamat and Desio committed numerous instances of mail and wire fraud in violation of 18 U.S.C. §1341 and 18 U.S.C. §1343.

8

41.     For example, each month during the duration of the project, which is believed to have been 2005 through 2011, Kamat and/or Desio submitted records, including certified payroll records, to Skanska reflecting the work that EEA "employees" were performing, knowing that, on the basis of these records, Skanska would submit monthly reports to the MTA reflecting EEA's DBE progress.  On the forms submitted by Skanska to the MTA concerning the Dey Street Concourse Project, Skanska certified, among other things, that none of the DBE subcontractors utilized employees or former employees of Skanska within the previous month, when, in fact, EEA had not only utilized former employees of Skanska but, in certain months, utilized employees of Skanska who had worked for Skanska at the beginning of that same month.

42.     The certifications by Skanska, Kamat and Desio included the false certification that the cartage and disposal work was being performed by a bona fide DBE.

43.     Skanska, Kamat and Desio used the United States Mails for transmitting these false certifications to the MTA.

44.     Those certification were false and Skanska, Desio and Kamat knew that they were false.

45.     Skanska, Desio and Kamat made those false certifications with the intent to defraud the MTA and with the intent for the MTA to rely on them.

46.     In furtherance of the Conspiracy, the defendants also transmitted, by means of wire or radio communications in interstate commerce, writings and sounds for the purpose of executing the Conspiracy.  These communications included numerous phone calls, emails and text messages between Kamat's residence in New Jersey and Skanska's business in New York as well as the project in New York.

9

47.     The Dey Street Concourse Project was only one of a number of projects for which EEA contracted to perform work for Skanska.  On multiple other projects for which Skanska served as prime contractors, Kamat and Desio entered into subcontracts with Skanska and endeavored to make it appear as though EEA was providing or would provide a commercially useful function when, in fact and as Skanska, Kamat and Desio well knew, either Skanska intended to effectively self-perform EEA's work, as occurred in connection with some of the Dey Street Concourse Project, or Skanska had arranged to have a third party non-DBE substantially perform EEA's work, such as in connection with the cartage and waste disposal work that was to have been performed by plaintiff.

48.     Plaintiff did not discover that defendants had participated in the conduct of EEA's affairs through a pattern of racketeering activity until July, 2011, when it was contacted by the MTA and asked to confirm Skanska's payment certifications.

49.     On about June 28, 2011, Kamat and Desio pled guilty to mail fraud in connection with the Dey Street Concourse Project.

50.     In about March 31, 2011, Skanska entered into a "non prosecution agreement" with the United States Attorney for the Southern District of New York.  Under this agreement, Skanska agreed to pay $19.6 million in restitution to the DOT and MTA for the DBE fraud conducted by Kamat, Desio and Skanska.

51.     As a result of the defendant's participation of EEA's affairs through a pattern of racketeering activity, plaintiff has suffered direct injury to its property and business. Among other things, defendants diverted to themselves the revenue and profits that rightfully and legally belonged to plaintiff under the Cartage Subcontract.

10

## First Claim

52.      Defendants conducted and participated in the conduct of EEA's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962.

53.      As a result of defendants' violation of 18 U.S.C. §1962, plaintiff has suffered damages to its property and business.

## Second Claim

54.      In carrying out the conspiracy, the defendants misappropriated, by fraud and commercial immorality, the good will and property rights of plaintiff.

55.      For example, when the MTA performed inspections of the Dey Street Concourse Project site, it was plaintiff's status as a bona fide DBE that caused the MTA to accept Skanska's certifications that the cartage and disposal work was being performed by a bona fide DBE.  Defendants then misappropriated this good will for themselves when they shut plaintiff out of the cartage and disposal work and fraudulently certified that the cartage and disposal work was being performed by a bona fide DBE, which the MTA accepted because of plaintiff's earlier demonstrated bona fides.

56.      Defendants also misappropriated for themselves, by fraud, the commercially valuable rights of plaintiff as a bona fide MBE and the property rights belonging to plaintiff under the Cartage Subcontract.

57.      Defendants' misappropriation of plaintiff's good will and property rights constituted the tort of unfair competition under New York law.

11

58.     As a result of defendants' unfair competition, plaintiff has suffered damages.

## Third Claim

59.     Skanska breached the Cartage Subcontract.

60.     As a result of Skanska's breach of the Cartage Subcontract, plaintiff has suffered damages.

61.     WHEREFORE, plaintiffs demand judgment for all relief provided under the applicable Statutes, ordinances and law under any theory or cause of action that can be supported based on the events and transactions alleged herein, whether or not specifically identified herein, including, without limitation:

a     Awarding plaintiff a money judgment for its damages, including but not limited to lost lost revenue, lost profits, consequential damages and punitive damages;

b     Awarding plaintiff treble damages under 18 U.S.C. §1964;

c     Awarding plaintiffs a statutory attorneys' fee pursuant to 18 U.S.C. §1964;

d     Awarding pre-verdict, post-verdict and prejudgment interest and costs;

e     Granting such further and additional relief as the Court deems just and appropriate under the circumstances.

Dated: New York, New York                    MICHAEL G. O'NEILL
     September 29, 2014                    (MO3957)

12

_____
Attorneys for Plaintiff
30 Vesey Street, Third Floor
New York, New York 10007
(212) 581-099

# Jury Demand

Plaintiffs demand trial by jury on all issues.

Dated: New York, New York
      September 29, 2014

MICHAEL G. O'NEILL
(MO3957)

_____
Attorneys for Plaintiff
30 Vesey Street, Third Floor
New York, New York 10007
(212) 581-0990

13