UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LETICIA, INC.,

                              Plaintiff,

         - versus -

SKANSKA USA CIVIL NORTHEAST, INC., BALU KAMAT, CARMINE DESIO, DOE CORPORATIONS 1-10, and DOES 1-10,

                              Defendants.

MEMORANDUM
AND ORDER
14-CV-5714 (JG)(LB)

APPEARANCES:

    LAW OFFICE OF MICHAEL G. O'NEILL
        30 Vesey Street, 3rd Floor
        New York, NY 10007
    By:    Benjamin L. Federici
        Kevin R. Schneider
        Michael G. O'Neill
        *Attorneys for Plaintiff Leticia, Inc.*

    WIGGIN AND DANA
        281 Tresser Boulevard, 7th Floor
        Stamford, CT 06901
    By:    Joseph W. Martini
        *Attorney for Defendant Skanska USA Civil Northeast, Inc.*

    WIGGIN AND DANA LLP
        450 Lexington Avenue, 38th Floor
        New York, NY 10017
    By:    Michael L. Kenny
        *Attorney for Defendant Skanska USA Civil Northeast, Inc.*

    LAW OFFICE OF MICHAEL ROSEN
        61 Broadway
        Suite 1105
        New York, NY 10006
    By:    Michael Rosen
        *Attorney for Defendant Balu Kamat*

JAMES R. FROCCARO
   20 Vanderventer Avenue
   Suite 103W
   Port Washington, NY 11050
   *Attorney for Defendants Balu Kamat and Carmine Desio*

JOHN GLEESON, United States District Judge:

      Plaintiff Leticia, Inc. ("Leticia") brings this action against Skanska USA Civil Northeast, Inc. ("Skanska"), Balu Kamat, Carmine Desio, Doe corporations, and Doe individuals for injuring Leticia's business and property as a result of racketeering activity. The complaint alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and brings New York common law claims for unfair competition and breach of contract. The action is presently before the Court on defendants'[1] motion to dismiss. Oral argument was heard on November 19, 2015.

      For the reasons that follow, the motion to dismiss is denied with respect to the racketeering and breach of contract claims and granted with respect to the unfair competition claim. Leticia is ordered to show cause in writing by Wednesday, January 6, 2016 why this case should not be held in abeyance pending the outcome of Leticia's breach of contract claims in state court.

---

[1] Defendant Skanska filed its motion to dismiss on September 29, 2015. *See* Mot. to Dismiss, ECF No. 34. Defendants Kamat and Desio filed a letter on September 30, 2015 joining in Skanska's motion. *See* Letter, ECF No. 36.

BACKGROUND

A. *The Parties*

Leticia is a trucking[2] and disposal company incorporated in New Jersey. Skanska is a construction company incorporated in New York. Kamat and Desio are the former president and vice president, respectively, of Environmental Energy Associates, Inc. ("EEA"), a now-defunct company that was incorporated in New York.

B. *The Allegations in Leticia's Amended Complaint*[3]

Leticia's amended complaint states that around 2004, the Metropolitan Transit Authority ("MTA") began construction of the Fulton Street Transit Center, a transit hub that connects a number of subway lines in Manhattan. Am. Compl. ¶ 24. The plans for the transit center included construction of the Dey Street Concourse, an underground passageway that enables passengers to transfer between the R/W and 4/5 subway lines. *Id.* The MTA awarded the $133 million Dey Street Concourse contract to Skanska in or about 2005. *Id.* ¶ 25.

One of the conditions of the contract was that Skanska was to make a good faith effort to enter into subcontracts with disadvantaged business enterprises ("DBEs"), and the total value of those subcontracts was to equal at least ten percent of the overall contract.[4] *Id.* ¶ 25. Leticia was a certified DBE[5] at the time. *Id.* ¶ 26. Around March 2006, Skanska entered into a

---

[2] "Trucking" and "cartage" are used interchangeably in this opinion.

[3] Leticia filed its original complaint on September 30, 2014. *See* Compl., ECF No. 1. It then filed an amended complaint on December 10, 2014. *See* Am. Compl., ECF No. 7.

[4] The U.S. Department of Transportation issued regulations in the 1980s to increase the participation of DBEs in federally-funded public construction contracts. *Id.* ¶ 14. The regulations require such contracts to include a goal for the percentage of a project that should be awarded to DBEs, and require contractors to make a good faith effort to meet the stated goal. *Id.*

[5] To become a certified DBE, a company must: (1) be owned and controlled by socially and economically disadvantaged individuals who own at least 51% of the company; (2) be an independent business; (3)

3

subcontract with Leticia, which stated that "[Leticia] would perform all the trucking and disposal of waste material from the Dey Street Concourse project." *Id.* ¶ 27. Leticia performed its contractual obligations from about March 2006 to March 2008. *Id.* ¶ 28. The Dey Street Concourse project lasted through 2011. *Id.* ¶ 41.

Leticia alleges that during this period, Skanska conspired[6] with Kamat and Desio to divert work from actual DBEs to EEA,[7] which then subcontracted that work to non-DBE companies. *See id.* ¶¶ 20, 38. Simultaneously, "Skanska, Desio and Kamat prepared and sent by the United States Mail to MTA paperwork falsely certifying that EEA was a bona fide DBE."[8] *Id.* ¶ 30. Leticia alleges that these actions were "a scheme by Skanska to defraud the MTA by purporting to satisfy the DBE requirements for the Dey Street Concourse project without actually subcontracting the required percentage of work to bona fide DBEs." *Id.* ¶ 29. The complaint alleges that defendants set up the scheme "in order to steal from plaintiff and appropriate for themselves the benefits of the [subcontract between Skanska and Leticia]." *Id.*

Leticia alleges that the vehicle for the scheme was a subcontract that Skanska entered into with EEA, pursuant to which EEA agreed to "perform concrete and miscellaneous demolition work on the Dey Street Concourse project." *Id.* ¶ 30. Kamat and Desio knew that

---

employ its own workforce; (4) own the equipment necessary to perform the work; and (5) be able to meet financial obligations. *Id.* ¶ 16. A company must be certified as a DBE in the state in which it seeks to work. *Id.*

[6] The date of the conspiratorial agreement is unknown to Leticia, but it is believed to be in or around 2005. *Id.* ¶ 29.

[7] Leticia alleges that Kamat and Desio used EEA to fraudulently benefit from a number of DBE contracts "[f]rom at least in or about 1997 up to and including in or about 2011." *Id.* ¶ 18.

[8] In June 2011, Kamat and Desio each pleaded guilty to one count of mail fraud, in violation of 18 U.S.C. § 1341. *Id.* ¶ 49. Skanska entered into a non-prosecution agreement with the U.S. Attorney for the Southern District of New York in March 2011. *Id.* ¶ 50.

4

EEA could not perform a "commercially useful function"[9] to help Skanska meet its DBE percentage goal, *id.* ¶¶ 17, 19, so "Skanska effectively self-performed the work[10] . . . and helped create the appearance" that EEA had satisfied its subcontract. *Id.* ¶ 33.

While "Skanska, Kamat and Desio intended to use EEA to defraud the MTA with respect to the cartage and disposal of waste materials" at the worksite as well, "doing so was more difficult" because the MTA physically inspected sites, and EEA did not own any trucks. *Id.* ¶ 36. Skanska therefore contracted with Leticia, which did own trucks, "in order to convince the MTA that it had entered into a subcontract with a bona fide MBE[11]" to perform its cartage and waste disposal work. *Id.* ¶ 37. After the initial phase of the project, however, the MTA stopped physically inspecting the site to verify Skanska's DBE contractors. *Id.* ¶ 38. Skanksa diverted Leticia's trucking and disposal work to non-DBE companies through EEA, as described above. *Id.* At some point, "Skanska stopped using [Leticia] for cartage and waste work" altogether, and Skanska, Kamat, and Desio arranged for all such work to be performed by non-DBE companies. *Id.* ¶ 39.

---

[9] According to the relevant rules and regulations, a DBE performs a commercially useful function only where it is: (1) responsible for the execution of the contracted work; (2) actually manages and performs the necessary work; and (3) furnishes the labor and equipment needed. *Id.* ¶ 17. A DBE does not perform a commercially useful function "if its role is limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation." *Id.*

[10] Leticia alleges that EEA did not employ anyone besides Kamat and Desio, did not own any "significant equipment," and did not have the expertise to supervise the broad array of work they agreed to perform. *Id.* ¶ 19. Skanska provided the necessary labor for the demolition work by moving three of its experienced foremen to EEA's payroll, as well as one of the foreman's crew of laborers. *Id.* ¶ 33. "[B]ecause EEA did not have the financial wherewithal to pay its workers, Skanska typically transferred funds to corporate bank accounts controlled by Kamat and Desio" so that EEA could issue the paychecks. *Id.* ¶35. Skanska also supplied both "large equipment like a compressor" and "smaller supplies like shovels and gloves" for the work. *Id.* ¶ 34. It made its utility shed available to EEA, "a benefit not regularly provided to any other subcontractor on the Dey Street Concourse Project." *Id.* Furthermore, "employees of Skanska negotiated the terms of equipment orders," but Kamat and Desio submitted the orders to "make it appear as though EEA was providing a commercially useful function." *Id.* ¶ 35.

[11] The complaint uses the acronyms "DBE" and "MBE," meaning "minority business enterprise," interchangeably.

Leticia contends that in order to defraud the MTA, Kamat and Desio submitted payroll records to Skanska reflecting the work of EEA's employees, "knowing that, on the basis of these records, Skanska would submit monthly reports to the MTA reflecting EEA's DBE progress." *Id.* ¶ 41. Skanska falsely certified to the MTA that none of its DBE subcontractors used Skanska's laborers from the current or previous month. *Id.* It also submitted "the false certification that the cartage and disposal work was being performed by a bona fide DBE." *Id.* ¶ 42. The complaint alleges that these statements were made through the mail with the knowing intent of defrauding the MTA. *Id.* ¶¶ 43-45.

C. *The Procedural History*

   1. *The State Court Action*

On September 26, 2014, Leticia filed a breach of contract suit against Skanska in New York County Supreme Court. *See* Defs.' Br., ECF No. 34-15, at 6; *see also* Kenny Decl., Ex. E, ECF No. 34-6. That complaint alleges that Skanska breached its subcontract with Leticia by failing to give it all of the trucking and disposal work necessary to completing the Dey Street Concourse project. Defs.' Br. at 6. It also alleges that Skanska breached the prime contract between Skanska and the MTA, of which Leticia was a third-party beneficiary. *Id.* Skanska moved to dismiss the state court complaint on June 8, 2015. *Id.* At oral argument, the parties stated that Skanksa's motion was denied. Plaintiff's counsel informed the Court on November 19, 2015 that the parties have agreed to await this decision before proceeding with the state court case.

   2. *The Instant Case*

Leticia commenced this action on September 30, 2014, claiming that defendants' conduct violated RICO, 18 U.S.C. § 1961 *et seq.*, causing Leticia to suffer injuries to its business

and property.[12] Am Compl. ¶ 51. Leticia alleges that, "[a]mong other things, defendants diverted to themselves the revenue and profits that rightfully and legally belonged to [it]."[13] *Id.* In addition to its RICO claim, Leticia asserts causes of action for unfair competition and breach of contract. Defendants move to dismiss Leticia's amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

DISCUSSION

A. *The Legal Standards*

In evaluating defendants' motion to dismiss, I must accept the factual allegations in Leticia's amended complaint as true and draw all reasonable inferences in its favor. *See, e.g.*, *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006). I must also "identify[] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see also id.* ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). If Leticia's complaint contains "well-pleaded factual allegations," I must "assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Id.*

In addition, where a complaint includes allegations of fraud, Rule 9(b) requires the fraud to be pleaded with particularity. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *see also Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (holding

---

[12] Leticia contends that it did not discover that Skanska had participated in EEA's racketeering activity until July 2011, when the MTA asked Leticia to confirm Skanska's payment certifications. Am. Compl. ¶ 48.

[13] Leticia filed for bankruptcy in September 2013, and its liquidation was closed on February 10, 2015. Defs.' Br. at 23. It has been retained by the bankruptcy trustee and does not dispute that any recovery in this case will be used to pay allowed claims against the bankruptcy estate. *See* Pl.'s Opp., ECF No. 38-6, at 15; O'Neill Decl., ECF No. 38, ¶ 7; *id.*, Ex. E, ECF No. 38-5.

7

RICO claim with predicate act of mail fraud to heightened pleading standard of Rule 9(b)). To meet the standard of Rule 9(b), "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (citation omitted). Courts have dismissed conclusory fraud allegations at the motion to dismiss stage for failure to meet Rule 9(b)'s heightened standard. *See, e.g.*, *Nasso v. Bio Reference Labs., Inc.*, 892 F. Supp. 2d 439 (E.D.N.Y. 2012); *Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442 (2d Cir. 1971).

> In adjudicating a Rule 12(b)(6) motion, I may consider:
>
> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (citations omitted).

With the foregoing principles in mind, I evaluate the defendants' objections to the sufficiency of Leticia's pleadings.

B. *Leticia's RICO Claim*

Leticia asserts a claim pursuant to 18 U.S.C. § 1962(c) against all defendants. Under that section of the RICO statute, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through

8

a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section (d) of the statute makes it "unlawful for any person to conspire to violate . . . the provisions of subsection . . . (c)." *Id.* § 1962(d). In addition to criminal penalties, RICO also authorizes private causes of action, which entitle a prevailing plaintiff to treble damages and attorney's fees. *See DLJ Mortg. Capital, Inc. v. Kontogiannis*, 726 F. Supp. 2d 225, 236 (E.D.N.Y. 2010) (citing 18 U.S.C. § 1964(c)). Specifically, RICO provides that "[a]ny person" may bring a civil action if he has been "injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). "From this language, courts have extracted the conditions a plaintiff must meet to satisfy RICO's standing requirements: '(1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation.'" *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767 (2d Cir. 1994) (citing *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir.1990)).

Lower federal courts have frequently expressed their disapproval of the fact that the private right of action under RICO has converted "garden variety" business disputes not only into federal cases, but federal cases implicating both treble damages and attorneys' fees. The early history of the statute included various efforts, mostly unsuccessful, to narrow the breadth of the RICO cause of action. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989) (rejecting Eighth Circuit rule that a "single scheme" is insufficient to establish a pattern of racketeering activity); *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985) (rejecting Second Circuit rule that a RICO cause of action can only proceed against a defendant who has been convicted of the charged predicate acts or of RICO violation). As one court put it, because RICO allegations have "an almost inevitable stigmatizing effect on those named as defendants[,] . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Figeroa Ruiz v.*

9

*Alegria*, 896 F.2d 645, 650 (1st Cir. 1990). The Supreme Court has made it clear, however, that so long as a complaint adequately alleges all of the elements of a RICO claim, it should not be dismissed, even if the conduct giving rise to the claim is not the sort of organized criminal activity at which the statute was aimed. *See Sedima*, 473 U.S. at 499 ("The fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." (alteration, citation, and quotation marks omitted)).

Defendants move to dismiss Leticia's RICO claims on grounds that it has failed to: (1) sufficiently state a claim under section 1962; (2) specify injuries to its business and property; and (3) allege that the defendants' claimed RICO violation was the actual and proximate cause of its injuries.

In order to allege a violation of section 1962(c), a plaintiff must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima*, 473 U.S. at 496. Defendants focus on the sufficiency of Leticia's pleadings with respect to the "enterprise" and "racketeering activity" elements of RICO.

1. *The Enterprise Element*

First, Skanska argues that Leticia's complaint makes conclusory allegations about its relationship with EEA without sufficiently describing how the two joined together to form an enterprise and what the structure of that enterprise may have been. *See* Defs.' Br. at 11. Defendants cite *United States v. Turkette*, 452 U.S. 576 (1981), to support their argument that an enterprise must have an ascertainable structure separate and apart from the alleged pattern of racketeering activity. *See* Defs.' Br. at 10-11. Defendants further contend that in alleging an association-in-fact enterprise, Leticia must offer facts relating to the purpose of the enterprise, the relationships of those associated with the enterprise, and the longevity sufficient to permit the

associates to pursue the purpose of the enterprise. *See id.* at 10 (citing *Boyle v. United States*, 556 U.S. 938, 955 (2009)).

These arguments misapprehend the allegations. Leticia has not alleged an association-in-fact enterprise.[14] Rather, it has alleged that EEA was the enterprise, and that "[d]efendants . . . participated in the conduct of EEA's affairs through a pattern of racketeering activity." Am. Compl. ¶ 52. Thus, even assuming that the specific attributes that give association-in-fact enterpises their requisite structure must be alleged in a RICO complaint, those facts are irrelevant here.

2. *The Pattern of Racketeering Activity Element*

Second, defendants argue that Leticia fails to sufficiently allege "any racketeering activity, let alone a pattern of such activity, to establish a Section 1962 violation" that would satisfy the heightened pleading standard of Rule 9(b).[15] Defs.' Br. at 12-13. "Most critically," defendants contend, "Leticia fails to allege which subcontractors . . . were fraudulently certified as DBEs." *Id.* at 13. Defendants submit Skanska's Contractor DBE Progress Report for March 2010 as an example of a certification submitted to the MTA which made no false allegations.[16]

---

[14] Section 1961(4) of RICO defines an enterprise as "any individual, partnership, *corporation*, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added).

[15] While defendants do not specifically argue that Leticia's complaint has failed to sufficiently allege racketeering acts that satisfy RICO's "pattern" requirement, I note that the complaint does "show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239. Leticia alleges that "each month during the duration of the project, which is believed to have been 2005 through 2011, Kamat and/or Desio submitted records, including certified payroll records, to Skanska . . . knowing that, on the basis of these records, Skanska would submit monthly reports to the MTA" that falsely certified that EEA had not utilized Skanska's current or former employees. Am. Compl. ¶ 41. This statement, along with similar allegations in the complaint, demonstrate close-ended continuity. *See GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 467 (1995) (stating that to establish close-ended continuity, "a plaintiff must provide some basis for a court to conclude that defendants' activities were neither isolated nor sporadic," and that they engaged in such activity for a substantial period of time) (citation and quotation marks omitted)).

[16] I cannot consider this submission at this stage because the progress report is not a document that Leticia had access to – let alone relied on – in stating the allegations in its complaint.

*See* Hussain Decl., Ex. 5, ECF No. 34-13. In addition, Skanska argues that Leticia cannot use Kamat's and Desio's guilty pleas on mail fraud charges to collaterally estop Skanska from asserting that it did not engage in racketeering activity. *See* Defs.' Br. at 14.

RICO defines racketeering activity to include "any act which is indictable" under certain Title 18 provisions, including mail fraud. 18 U.S.C. § 1961(1)(B). "To prove a violation of the mail fraud statute, plaintiffs must establish the existence of a fraudulent scheme and a mailing in furtherance of the scheme." *McLaughlin v. Anderson*, 962 F.2d 187, 190-91 (2d Cir. 1992) (citing *Schmuck v. United States*, 489 U.S. 705, 712 (1989)). It need not be alleged that the defendant himself mailed a letter, but the plaintiff must show "1) that the defendants 'caused' the mailing . . . , and 2) that the mailing was for the purpose of executing the scheme or, in other words, 'incident to an essential part of the scheme.'" *United States v. Bortnovsky*, 879 F.2d 30, 36 (2d Cir. 1989) (quoting *Pereira v. United States*, 347 U.S. 1, 8-9 (1954)). As noted above, pursuant to Rule 9(b), a plaintiff must plead the elements of mail fraud with particularity to survive a motion to dismiss, including statements alleged to be false or misleading, those responsible for the statements, and when and where the statements were made. *See Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 228 (E.D.N.Y. 2014).

Here, in alleging numerous instances of mail fraud as the predicate acts, the amended complaint states that:

> In connection with the EEA Subcontract, Skanska, Desio and Kamat prepared and sent by the United States Mail to MTA paperwork falsely certifying that EEA was a bona fide DBE. The certifications made by Skanska, Desio and Kamat included representations that EEA had the necessary employees, management and equipment to perform the work under the EEA Subcontract and that EEA performed a 'commercially useful function' at the Dey Street Concourse Project.

Am. Compl. ¶ 30; *see also id.* ¶ 39 ("Upon information and belief, . . . Skanska, Kamat and Desio certified to the MTA that the cartage and disposal work was being performed by a bona fide MBE."). It further states that:

> On the forms submitted by Skanska to the MTA concerning the Dey Street Concourse Project, Skanska certified, among other things, that none of the DBE subcontractors utilized employees or former employees of Skanska within the previous month, when, in fact, EEA had not only utilized former employees of Skanska but, in certain months, utilized employees of Skanska who had worked for Skanska at the beginning of that same month.

*Id.* ¶ 41. It can be inferred from the complaint that these false certifications occurred "each month during the duration of the project, which is believed to have been 2005 through 2011." *Id.*

Leticia also relies on the non-prosecution agreement between Skanska and the government, the indictment of Kamat and Desio, and the criminal judgment against Kamat. The indictment[17] states, "On or about September 17, 2009, KAMAT mailed to the MTA in Manhattan, New York a payment verification form certifying, among other things, that EEA had not utilized employees or former employees of Contractor #1."[18] O'Neill Decl., Ex. B, ECF No. 38-2, at 17.

Taking the facts alleged in the complaint and the additional documents into consideration, Leticia meets the heightened standard of Rule 9(b) in alleging racketeering activity consisting of a series of acts of mail fraud. The fraudulent statements include false representations that EEA had the employees and equipment to perform the work under the EEA Subcontract and that EEA performed a "comercially useful function" at the Dey Street

---

[17] The indictment is "integral" to Leticia's complaint because it forms the basis of its racketeering allegations against defendants. The complaint paraphrases whole sections of the indictment.

[18] Leticia alleges that "Contractor-1 was Skanska;" the indictment describes Contractor-1 as being involved with the Dey Street Concourse project. *See* O'Neill Decl. at 2; *id.*, Ex. B, ECF No. 38-2, at 6-9.

Concourse Project. Am. Compl. ¶ 30. It also alleges that Skanska, Kamat, and Desio made the fraudulent statements, and that they used the mails to make them with the intent to defraud the MTA. *Id.* ¶¶ 43, 45. The complaint alleges that repeated acts of mail fraud were committed from 2005 through 2011 on forms submitted by Skanska to the MTA. *Id.* ¶ 41.

Furthermore, Kamat's and Desio's guilty pleas make Leticia's mail fraud allegations against them more than plausible. *Cf. Sedima*, 473 U.S. at 490-92 (discussing that RICO claims may even proceed against individuals who have not been criminally convicted). And while Skanska is likely correct in assuming that the non-prosecution agreement it signed cannot preclude it from denying the mail fraud allegations here, the agreement nonetheless lends additional plausibility to Leticia's allegations.

The amended complaint sufficiently states a violation of section 1962(c).[19]

3. *Injury to Business or Property*

Defendants also contend that the complaint fails to adequately allege injury that is congnizable under RICO. A plaintiff has standing to pursue a RICO claim only where "he has been injured in his business or property by the conduct constituting the RICO violation, and only when his . . . actual loss becomes clear and definite." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006) (alterations, citations, and quotation marks omitted). In order to satisfy the "by reason of" language of section 1964(c), a RICO plaintiff "must allege facts demonstrating . . . that plaintiff's injury is to its property, and not, for example, physical,

---

[19] While defendants do not raise this issue, I also find that Leticia has sufficiently pleaded a violation of section 1962(d), which makes it "unlawful for any person to conspire to violate . . . the provisions of subsection . . . (c)." 18 U.S.C. § 1962(d). A plaintiff alleging RICO civil conspiracy "at the very least, must allege specifically . . . an agreement [to commit predicate acts]." *Hecht*, 897 F.2d at 25. Leticia states that "in or around 2005, the defendants . . . entered into an agreement . . . to participate in the conduct of EEA's affairs through a pattern of racketeering activity . . . . The Conspiracy was part of a scheme by Skanska to defraud the MTA." Am. Compl. ¶ 29.

14

emotional or reputational harm." *State Farm Mut. Auto. Ins. Co. v. CPT Medical Services, P.C.*, 375 F. Supp. 2d 141, 152 (E.D.N.Y. 2005); *see also id.* (allegation that plaintiff suffered damages in excess of $2,500,000 as a result of defendant's conspiracy to commit mail fraud sufficiently stated injury-in-fact to withstand defendants' motion to dismiss).

Leticia alleges that it "has suffered direct injury to its property and business" as a result of defendants' racketeering activity.[20] Am. Compl. ¶ 51. Specifically, it alleges that the work it contracted to perform went to non-DBE companies instead, and the defendants fraudulently led the MTA to believe that the work was going to DBE companies. *See id.* ¶ 39.

Defendants argue that "Leticia was not entitled to receive all of the Dey Street Project's T&D[21] work" under its subcontract with Skanska, which was a unit-price contract.[22] Defs.' Br. at 15. They claim that "the MTA was aware, and actually approved, of Skanska's use of other subcontractors – including one other DBE and one non-DBE – to perform the Dey Street Project's T&D work pursuant to unit-price contracts." *Id.* at 16. Skanska contends that it was "free to call on any of the other project-approved T&D subcontractors, which is exactly what [it] did once Leticia proved unable to handle the workload required." *Id.*

At this stage, however, the merits of Leticia's factual claims are not at issue. In alleging that it lost business that it expected to receive pursuant to its subcontract with Skanska,

---

[20] In its opposition brief, Leticia claims that it "received about half a million dollars less in work than its contract with Skanska called for." Pl.'s Opp. at 9. Because this information was not relied upon or submitted with the complaint, I will ignore it for the purposes of this motion.

[21] "T&D" is shorthand for "trucking and disposal" work.

[22] Defendants explain that a unit-price subcontract entitles the subcontractor to be compensated only for the actual number of units performed, as opposed to lump-sum contracts, which award a fixed sum. *See* Defs' Br. at 3 n.2.

Leticia has sufficiently alleged that its injuries were to its property and business. It has therefore satisfactorily alleged the injury-in-fact element of RICO.

    4. *Proximate Cause*

The sufficiency of Leticia's complaint with respect to the final RICO element of causation is also contested. In order to properly plead causation, a plaintiff must adequately allege that the RICO violation was both the actual and proximate cause of his injury. *Sky Med. Supply*, 17 F. Supp. 3d at 234 (citing, *e.g.*, *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010)). In *Holmes v. Securities Investor Protection Corp.*, the Supreme Court stated that the "proximate cause" element of RICO is a generic label for "the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." 503 U.S. 258, 268 (1992). On a basic level, proximate cause is "a demand for some direct relation between the injury asserted and the injurious conduct alleged." *Id.* Furthermore, "where mail fraud is the predicate act for a civil RICO claim, the proximate cause element articulated in *Holmes* requires the plaintiff to show 'reasonable reliance'" on the fraudulent statements to cause the plaintiff injury. *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 176 (2d Cir. 2004).

Defendants argue that the alleged RICO violation could not have caused Leticia injury because EEA performed an entirely different type of work for the Dey Street Concourse project. Defs.' Br. at 17-18. They state that "Leticia's failure to perform as required is the only conceivable proximate cause of its [injury]." *Id.* at 18. Defendants further state that "Leticia simply cannot contend that it suffered any injury proximately caused by the alleged predicate act of falsely certifying that EEA or any of its subcontractors were bona fide DBEs." *Id.*; *see also* Defs.' Reply, ECF No. 39, at 3 (emphasizing that the mail fraud was committed on the MTA, and not on Leticia).

Again, defendants' argument addresses the merits of Leticia's allegations, not their sufficiency. Leticia has alleged that its loss of profits was due to the defendants' alleged scheme to defraud the MTA. Taken together, its allegations support the inference that Skanska would have continued to use Leticia for its trucking and disposal needs but for its fraud on the MTA, which enabled it to use non-DBE companies instead. The Second Circuit has held in analogous circumstances that business injury to a competitor of a RICO defendant whose fraudulent statements were made to the government was cognizable under RICO. In *Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc.*, 271 F.3d 374 (2d Cir. 2001), a cleaning service alleged that a competitor engaged in racketeering activity by hiring undocumented immigrants in violation of the Immigration and Nationality Act, a RICO predicate offense. *Id.* at 378. The court held that "[the defendant] was able to underbid its competitors because its scheme to hire illegal immigrant workers permitted it to pay well below the prevailing wage for legal workers." *Id.* at 382. The court acknowledged that the plaintiff could have lost the business for other reasons, but nonetheless held that it "was no less directly injured" than the plaintiffs in *Holmes*.[23] *Id.*

---

[23] In *Holmes*, the Securities Investor Protection Corporation alleged that defendants participated in a conspiracy to manipulate the value of the stock of several companies. 503 U.S. at 262. The suit was brought on behalf of the customers of two injured broker-dealers who dealt in large amounts of the manipulated stock. *Id.* at 270. The customers became unsecured creditors of the firms when the firms became insolvent. *Id.* The Supreme Court applied a proximate cause test requiring a "direct relation between the injury asserted and the injurious conduct alleged," *id.* at 268, and determined that the link between the customers' losses and the defendants' stock manipulation was too remote to satisfy the test. *Id.* at 271. The Court noted that the liquidating trustees suing directly on behalf of the defunct broker-dealers would have been the proper plaintiffs. *Id.* at 273. However, the Court expressly warned against applying a mechanical test detached from the policy considerations associated with the proximate cause analysis. *See id.* at 272 n.20 ("[O]ur use of the term 'direct' should merely be understood as a reference to the proximate-cause enquiry that is informed by the [policy] concerns set out in the [opinion].").

Defendants argue that *Commercial Cleaning* does not apply to this case because "Leticia and Skanska are not, nor have they ever been competitors such that actions by Skanska could have a direct effect on Leticia." Defs.' Supp. Br., ECF No. 40-1, at 1. I disagree. The complaint alleges that Skanska enjoyed a commercial advantage by committing mail fraud, and that it enjoyed that advantage at Leticia's expense. By using non-DBE trucking and disposal companies to do the work Leticia was contracted to perform, Skanska was able to utilize other, more desireable methods, and therefore compete unfairly. It is plausible that its alleged fraudulent scheme with EEA facilitated the diversion of profits from Leticia to non-DBA companies the MTA would not have otherwise permitted it to use.

In sum, Leticia's complaint sufficiently states a RICO violation and satisfies the standards of Rule 9(b) where applicable.

C. *Leticia's State Law Claims*

Leticia also brings claims for unfair competition and breach of contract against defendants pursuant to New York law. The Court has supplemental jurisdiction over these claims.

1. *Unfair Competition*

Leticia's unfair competition claim is based on "[d]efendants' misappropriation of [its] good will and property rights." Am. Compl. ¶ 57. It alleges that Skanska misused Leticia's status as a bona fide DBE to convince the MTA that its trucking and disposal was indeed being performed by DBEs. *See id.* ¶¶ 54-58. These allegations fail to state a plausible claim of unfair competition.

In New York, "[a]n unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use

18

of the same property." *Roy Exp. Co. Establishment of Vadus, Liechtenstein v. Columbia Broad. Sys.*, 672 F.2d 1095, 1105 (2d Cir. 1982). The common law tort stems from the Supreme Court's decision in *Int'l News Serv. v. Assoc. Press*, 248 U.S. 215 (1918), in which the Court upheld an injunction precluding the INS from copying AP news bulletins, which AP had compiled at its own expense, and then selling that information in competition with AP. Here, there is no analogous allegation that defendants attempted to use Leticia's name to commercially benefit from its efforts or reputation to compete with it or otherwise injure its business. Even assuming that a false certification by Skanska to the MTA that it was using Leticia's services could amount to unfair competition, that is not what Leticia alleges. Instead, the allegation is that defendants falsely certified that EEA was a DBE, which does not make out a plausible claim of misappropriation. The claim is dismissed.

2. *Breach of Contract*

Leticia also alleges that Skanska breached its subcontract by failing to satisfy all of its trucking and disposal needs with Leticia's services. Defendants contend that the claim is time-barred because it was not filed within the six-year statute of limitations. *See* Defs.' Br. at 16. The amended complaint, however, states that the subcontract continued "through 2011," Am. Compl. ¶ 41, and the original complaint was filed on September 30, 2014. Leticia therefore brought its breach of contract claim within the statute of limitations.

Defendants further state that Leticia has failed to state a breach of contract claim because it was properly compensated for the work it completed and "did not receive a greater portion of the . . . T&D work available . . . because [it] did not have the capacity to perform when called upon." Defs.' Br. at 23. These factual defenses are not properly evaluated at the

motion to dismiss stage. Defendants' motion is accordingly denied with respect to Leticia's contract claim because Leticia has alleged sufficient facts to make the claim plausible.

As discussed at oral argument, however, Leticia filed a lawsuit including a nearly identical contract claim in state court. Moreover, the claim is based on conduct that lies at the heart of its RICO claim. It is this Court's view that Leticia's state and federal lawsuits should not proceed in parallel because the result would be an inefficient use of judicial resources. Leticia is directed to show cause why this case should not be held in abeyance until the state court issues a decision on its breach of contract claims.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the unfair competition claim is granted. The motion to dismiss the racketeering and breach of contract claims is denied. Leticia is directed to show cause in writing by Wednesday, January 6, 2016 why this case should not be held in abeyance until its state court case is resolved.

So ordered.

John Gleeson, U.S.D.J.

Dated: December 29, 2015
       Brooklyn, New York